*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 4, 2021

Plaintiff-Appellee,

v

No. 353266
Ingham Circuit Court

MICHAEL MAGIK JONES,

LC No. 18-000724-FC

Defendant-Appellant.

Before: MARKEY, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant, Michael Magik Jones, appeals as of right his convictions following a jury trial of two counts of assault with intent to commit murder, MCL 750.83, felon in possession of a firearm, MCL 750.224f, and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 60 to 100 years for each assault conviction and 6 to 20 years for the felon-in-possession conviction, to be served consecutively to three concurrent two-year terms of imprisonment for the felony-firearm convictions. We affirm.

## I. FACTUAL BACKGROUND

Defendant was charged in two separate cases involving a series of related events that occurred on March 31, 2018, in Lansing, Michigan. The events began with a shooting at an apartment that belonged to Brandi Hubbard, the sister of defendant's ex-girlfriend, Jendayi Guy. According to Hubbard's preliminary hearing testimony, she heard a knock on her apartment door, but no one was there. She stepped out onto her balcony that faced the parking lot. She saw defendant and asked him what he wanted. Defendant then pulled out a gun and fired at the apartment. Approximately 45 minutes after the apartment shooting, a witness to that shooting recognized defendant on a nearby street and contacted the police. While Lansing Police Officer Sarah Willson was investigating the apartment shooting and speaking to Hubbard, she was called away to the location where defendant had been spotted. When she encountered defendant, she ordered him to stop, but he continued walking away and then turned and fired a gun at her from

-1-

20 to 30 yards away. Officer Willson returned the gunfire, but did not hit defendant. Defendant ran around a corner and into a lumber yard, and Officer Willson called for assistance.

Officers from the police department's special tactics and rescue team (SMART) were dispatched to the scene and a police helicopter also responded. After the helicopter reported defendant's possible location in the lumber yard, the SMART team moved in while inside a BearCat, which is an armored, bullet-resistant, personnel carrier. The officers spotted defendant, who was lying on his back on the ground along the side of a building and pointing a firearm at the officers. As the BearCat drove past the building nearby defendant, defendant shot at the passenger side of the BearCat multiple times. According to one officer, defendant fired the gun while deliberately pointing it at the officer's head. The officers returned the gunfire and wounded defendant, disabling him. After securing defendant, the police found a .45-caliber Glock handgun lying nearby. These events were captured on video, including from the helicopter, and admitted as evidence at trial.

The police recovered a spent bullet from the scene of the apartment shooting and also recovered several spent shell casings and spent bullets from the scene of the officer-involved shooting. Ballistics testing showed that seven of the shell casings and one of the spent bullets recovered from the scene of the officer-involved shooting contained marks indicating that they were fired from the Glock handgun that was found near defendant. The bullet recovered from the apartment also matched the Glock handgun. Testing of the Glock handgun also revealed the presence of DNA that matched defendant's DNA profile.

In Case No. 18-000743-FH, defendant was charged with offenses related to the initial apartment shooting (the "apartment shooting" case), and in Case No. 18-000724-FC he was charged with offenses related to the officer-involved shooting (the "officer-involved shooting" case). The trial court granted the prosecutor's pretrial motion to join these two cases for trial.

At trial, Officer Willson testified regarding her initial investigation of the apartment shooting and her later encounter with defendant. A body camera recorded her interactions at both locations. Video footage of her encounter with defendant was introduced at trial and played for the jury, but the footage from her earlier encounter with Hubbard while investigating the apartment shooting was never introduced. During deliberations, the jury was provided with the exhibit that contained the video footage from Officer Willson's body camera. However, the jury was mistakenly given an unredacted video, which contained footage of both Officer Willson's initial encounter with Hubbard, which had not been introduced at trial, and the admitted portion involving her encounter with defendant.

The jury convicted defendant as charged in both cases.[1] After trial, the judge spoke to the jurors, who reported that they had watched the video footage from Officer Willson's body camera during deliberations. According to the trial court, however, the jurors indicated that when they

---

[1] All of the convictions at issue in this appeal arise from the officer-involved shooting case. In the apartment shooting case, the jury found defendant guilty of discharge of a firearm at a building, MCL 750.234b, carrying a concealed weapon, MCL 750.227, and felony-firearm.

realized that the exhibit contained additional footage that had not been introduced at trial, they skipped ahead and watched only the portion that had been introduced into evidence.

Defendant moved for a new trial, arguing in part that he was prejudiced by the jurors' exposure to extraneous video footage that had not been introduced at trial. The trial court analyzed the likely impact of the extraneous video footage on each of the two cases separately. After observing that the unadmitted portion of the video was related only to the charges concerning the apartment shooting and was "not directly supportive of" the charged assaults in the officer-involved shooting, the court denied defendant's motion for a new trial in the officer-involved shooting case. However, because the extraneous video footage directly related to the charges in the apartment shooting case, it had not been introduced at trial, and it was unknown how much the jury may have viewed it or whether it influenced the jury's verdict, the court granted defendant's motion for a new trial in the apartment shooting case. Thus, only defendant's convictions in Case No. 18-000724-FC (the officer-involved shooting case) are at issue in this appeal.

II. ANALYSIS

A. JOINDER

Defendant first argues that the trial court erred by joining the apartment shooting and officer-involved shooting cases for trial. We disagree.

In *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009), the Michigan Supreme Court explained:

> Generally, this Court reviews questions of law de novo and factual findings for clear error. The interpretation of a court rule, like matters of statutory interpretation, is a question of law that we review de novo. To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute "related" offenses for which joinder is appropriate. Because this case presents a mixed question of fact and law, it is subject to both a clear error and a de novo standard of review. [Citations omitted.]

However, the ultimate decision regarding permissive joinder of related cases "lies 'firmly within the discretion of trial courts.' " *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014), quoting *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011). A trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MCR 6.120(B), which governs postcharging permissive joinder, provides:

> **Postcharging Permissive Joinder or Severance**. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the

-3-

parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

(3) If the court acts on its own initiative, it must provide the parties an opportunity to be heard.

Similarly, MCR 6.120(C) provides that "[o]n the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)." The Supreme Court has explained that charges are not related "simply because they [are] of the same or similar character." *Williams*, 483 Mich at 235 (quotation marks and citation omitted). However, joinder is appropriate when charges are "logically related" and "there is a large area of overlapping proof." *Id*. at 237 (quotation marks and citation omitted).

The prosecutor moved for joinder of the apartment shooting case, the officer-involved shooting case, and a third case involving a shooting assault on February 27, 2018. The prosecution filed its motion on November 4, 2019, two months before defendant's scheduled trial. The prosecutor argued that joinder was appropriate because the cases involved a series of connected acts. The prosecutor noted that a ski mask associated with the February 27, 2018 shooting offense was found in the same car that defendant was driving on the day of the apartment and officer-involved shootings, and that bullets recovered from the February 27 shooting and from Hubbard's apartment both matched the Glock handgun recovered near defendant at the time of the officer-involved shooting. Defendant argued that joinder of the three cases would be inappropriate and the prosecutor eventually agreed that the case involving the February shooting assault should be tried separately. However, the trial court found that the remaining two cases—the apartment shooting and the officer-involved shooting—were sufficiently connected and it was appropriate to join those two cases for trial.

The trial court did not abuse its discretion. The court correctly found that the two cases were related as defined by the court rule. Defendant's actions on March 31, 2018 involved a series of connected acts. They happened on the same day, approximately 45 minutes apart, in geographic proximity to each other. The evidence showed that defendant left the scene of the apartment shooting on foot, and it was a witness to the apartment shooting who alerted the police to defendant's location where the officer-involved shooting occurred. Both cases involved the

-4-

discharge of a firearm and the two series of acts involved the same ballistics evidence. The two events were also connected insofar that the circumstances of the apartment shooting provided context for an understanding of the sequence of events that led to the officer-involved shooting.

After the apartment shooting, defendant remained in the area and was again spotted by a witness to the apartment shooting. When the police responded to the area and tried to question defendant about the apartment shooting, he ignored their commands, shot at the officers, and fled, which directly led to the shootout at the lumber yard. The prosecution persuasively argues that without joining the two cases, the jury could have been confused about why the police initiated contact with defendant, and why, without any conversation, he would simply shoot at the officers. To the extent that some of the evidence related to the apartment shooting would have been admissible under MRE 404(b)(1) at a separate trial of the officer-involved shooting, allowing such evidence to be introduced piecemeal could have been more confusing to the jury. We disagree with defendant's contention that the apartment shooting "had nothing to do with the case involving the police."

Defendant appears to argue that because each case *could* have proceeded separately, they should not have been joined. However, that is not the test under MCR 6.120(B). Consideration of the factors listed in MCR 6.120(B)(2) supports joinder. The motion for joinder was filed two months before trial, which provided ample opportunity for the defense to prepare for a trial of both cases. The facts of the two cases were not complex and presented little potential for confusion with respect to determining defendant's guilt or innocence in each case. Had the cases been severed, many of the witnesses, such as the witness to the apartment shooting, and Officers Willson and Ryan Kellom, would have been required to testify in both cases. Joinder thus offered convenience to the court, the victims, and witnesses. Defendant argues that it was more prejudicial for the jury to be presented with all of the charges in the two cases than it would have been to introduce evidence of defendant's other acts at separate trials under MRE 404(b)(1). One of the factors to consider under MCR 6.120(B)(2) is "the potential for confusion or prejudice stemming . . . from the number of charges." However, as our Supreme Court has observed, " '[j]oinder of . . . other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial.' " *Breidenbach*, 489 Mich at 13, quoting *Williams*, 483 Mich at 237, quoting *United States v Harris*, 635 F2d 526, 527 (CA 6, 1980). See also *United States v Foutz*, 540 F2d 733, 736 (CA 4, 1976) ("In those instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together.")

Accordingly, the trial court did not abuse its discretion by granting the prosecutor's motion to join the apartment shooting and the officer-involved shooting cases for trial.

B. ADMISSIBILITY OF HUBBARD'S PRELIMINARY EXAMINATION TESTIMONY

Defendant next argues that the trial court erred by permitting the prosecution to introduce Brandi Hubbard's preliminary examination testimony after finding that she was an "unavailable witness" and that the prosecution had exercised due diligence in attempting to secure her presence at trial. Defendant also asserts that the admission of Hubbard's preliminary examination testimony violated his constitutional right to confront the witnesses against him. Although we are not

persuaded that the trial court abused its discretion by admitting Hubbard's preliminary examination testimony, we also conclude that any error was harmless beyond a reasonable doubt.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Farquharson*, 274 Mich App 268, 271; 731 NW2d 797 (2007). We also review for an abuse of discretion a trial court's decision whether a witness is unavailable. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "However, decisions regarding the admission of evidence frequently involve preliminary questions of law, e.g., whether a rule of evidence or statute precludes admissibility of the evidence." *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). We review questions of law de novo. *Id*. Whether a defendant's Sixth Amendment right of confrontation was violated is also reviewed de novo. *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011).

The parties do not dispute that Hubbard's preliminary examination testimony qualifies as hearsay under MRE 801(c). Hearsay is not admissible except as provided by the Michigan Rules of Evidence. MRE 802. MRE 804(b)(1) provides an exception to the general prohibition against hearsay for former testimony by a declarant who is unavailable as a witness. The rule allows the use of "[t]estimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Under MRE 804(a)(5), a witness is unavailable if, in pertinent part, the witness is "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." "The test for whether a witness is 'unavailable' as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Bean*, 457 Mich at 684. See also *People v James*, 192 Mich App 568, 571; 481 NW2d 715 (1992).

First, to the extent that defendant suggests that Hubbard's preliminary examination testimony was not admissible because it was given in the apartment shooting case, and thus, he did not have an opportunity to cross-examine her in the officer-involved shooting case, we reject that argument. MRE 804(b)(1) allows for the use of former testimony given in "the same or a different proceeding." In addition, although the preliminary examination at which Hubbard testified concerned only the apartment shooting case, defendant had the opportunity and same motive to develop her testimony relative to that case at the time of the preliminary examination. Although defendant did not have a motive to develop Hubbard's testimony at that preliminary examination relative to the officer-involved shooting case, she was not a witness to the offenses in that case and her testimony was not offered for any purpose related to that case. In other words, her testimony was not offered for any purpose for which defendant did not have an opportunity or a motive to develop her testimony relative to the case for which it was offered.

Defendant further argues, however, that Hubbard was not an unavailable witness because the prosecution failed to exercise due diligence to secure her presence at trial. The record indicates that Hubbard had moved to Texas, the prosecution became aware of her location there, and it delivered a subpoena to her, but she informed the prosecution that she did not intend to return to Michigan for trial. She continued to refuse to return and testify even after the prosecution offered

to arrange for her transportation to Michigan. This information was shared with the trial court and defense counsel.

On appeal, defendant suggests that the prosecution's efforts to secure Hubbard's presence at trial were insufficient because it failed to use an "interstate subpoena." However, defendant does not explain what such a subpoena is or how it operates. The only authority cited by defendant concerning this allegedly alternative means of securing Hubbard's presence is an Internet article discussing the model "Interstate Depositions and Discovery Act." However, the summary also clearly points out that Texas has not adopted this act. Michigan has adopted the Uniform Interstate Depositions and Discovery Act, MCL 600.2201 *et seq.*, which governs subpoena requests from foreign states. However, this act does not provide Michigan courts with authority for ordering an arrest of a Michigan resident for transport to another state. Rather, it is a mechanism for a Michigan court to act on a foreign subpoena and issue its own subpoena "for service upon the person to which the foreign subpoena is directed." MCL 600.2203(2). While a subpoena under this act can require a person to attend a deposition, produce documents for inspection, or permit inspection of premises under the person's control, it does not include compelling a person's presence at trial. See MCL 600.2202(e). Thus, even if Texas had adopted a similar act, it is not apparent, and defendant does not discuss, how such an act would have provided a mechanism by which the prosecution could have compelled Hubbard's arrest and return to Michigan to testify. Defendant does not otherwise explain what legal recourse the prosecution could have utilized to secure Hubbard's presence at trial. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (quotation marks and citation omitted). Accordingly, defendant has not shown that the trial court abused its discretion when it found that the prosecution had exercised due diligence to secure Hubbard's presence at trial.

Defendant's concurrent constitutional argument also fails. The Confrontation Clause bars the admission of testimonial hearsay (e.g., preliminary examination testimony) of a witness who does not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v Washington*, 541 US 36, 53-54, 68; 124 S Ct 1354, 158 L Ed 2d 177 (2004); *People v Payne*, 285 Mich App 181, 197; 774 NW2d 714 (2009). As under MRE 804(b)(1), to show that a witness is unavailable, the prosecution must exercise due diligence to locate and secure the witness for trial. *Bean*, 457 Mich at 682-683; *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). Because defendant has not shown that the trial court abused its discretion when it determined that the prosecution exercised due diligence, defendant cannot show that the use of Hubbard's preliminary examination testimony violated his right of confrontation.

In any event, even if the trial court erred by admitting Hubbard's preliminary examination testimony, and even assuming that the error qualifies as constitutional error, we would conclude that the error was harmless beyond a reasonable doubt, at least with respect to defendant's convictions in the instant officer-involved shooting case. A preserved constitutional error is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005). The party who benefited from the error must demonstrate that there is no reasonable possibility

that the evidence complained of might have contributed to the conviction. *People v Anderson* (*After Remand*), 446 Mich 392, 406; 521 NW2d 538 (1994). Hubbard's testimony was relevant only to the apartment shooting case, and her testimony presented at trial was redacted as a result of an agreement between the parties. Although it is reasonably likely that her testimony contributed to defendant's convictions in that case, the trial court granted defendant's motion for a new trial in that case. With respect to the officer-involved shooting case, her testimony may have provided some background context for enabling the jury to understand why the police initially confronted defendant and why he would not cooperate when approached by the police, but this same information was also provided by Holly Peck, a witness to the original apartment shooting, who testified that she later saw defendant again less than an hour later and recognized him as the same person involved in the apartment shooting, whereupon she contacted the police and alerted them to defendant's location. More significantly, Hubbard was not a witness to any of the events surrounding the officer-involved shooting and did not offer any testimony related to the offenses in that case. Accordingly, there is no reasonable possibility that her testimony might have contributed to defendant's convictions in the officer-involved shooting case. Thus, any error in admitting her preliminary examination testimony qualifies as harmless beyond a reasonable doubt.

## C. EXTRANEOUS VIDEO FOOTAGE

Defendant argues that reversal is required because the jury was exposed to video footage from Officer Willson's body camera that was not introduced at trial. We disagree.

The trial court denied defendant's motion for a new trial on this issue. We review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). Any findings of fact are reviewed for clear error. *People v Mendez*, 225 Mich App 381, 382; 571 NW2d 528 (1997).

In *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997), our Supreme Court explained:

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. We examine the error to determine if it is harmless beyond a reasonable doubt because the error is constitutional in nature. The people may do so by proving that either the extraneous influence was duplicative of evidence produced at trial or the evidence of guilt was overwhelming. [Citations omitted.]

In this case, it is undisputed that the jury was exposed to extraneous evidence when it was provided with an exhibit during deliberations that contained video footage of Officer Willson's initial

encounter with Hubbard while investigating the apartment shooting, which was not introduced at trial. Therefore, the material inquiry is whether there is a real and substantial possibility that this extraneous video footage could have affected the jury's verdict in the instant officer-involved shooting case.

Considering both the nature of the extraneous video footage and the other evidence in the officer-involved shooting case, defendant has not met his initial burden of showing that the objectionable portion of Officer Willson's body camera footage was "substantially related to a material aspect of the [officer-involved shooting] case and that there is a direct connection between the extrinsic material and the adverse verdict" in that case. *Id*. at 89. The extraneous video footage involved Officer Willson's initial encounter with Hubbard while investigating the apartment shooting. That footage is connected to the instant officer-involved shooting case only to the extent that it provided context for understanding why the police were looking for defendant after the apartment shooting. It did not depict any of the events surrounding the officer-involved shooting. Indeed, video footage of Officer Willson's later encounter with defendant leading up to the officer-involved shooting was introduced at trial, and therefore, could properly be considered by the jury. While the trial court determined that the objectionable portion was substantially related to the jury's finding of guilt in the apartment shooting case, and therefore granted a new trial in that case, it did not err when it determined that the evidence was not substantially related to the instant officer-involved shooting case and that there was no direct connection between the evidence and the adverse verdict in this case.

Accordingly, the trial court did not abuse its discretion by denying defendant's motion for a new trial with respect to this issue.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he is entitled to a new trial because his trial counsel was ineffective. We disagree.

Although defendant raised this issue in a motion for a new trial, the trial court denied defendant's motion without holding a *Ginther*[2] hearing. Therefore, our review is limited to mistakes apparent from the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). "Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *Id.* To establish ineffective assistance of counsel, defendant must show that (1) counsel's representation "fell below an objective standard of reasonableness," and (2) but for counsel's deficient performance, "there is a reasonable probability that the outcome of the proceeding would have been different." *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), citing *Strickland v Washington*, 466 US 668, 688-694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. Defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Because the defendant bears the burden of demonstrating both

---

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

## 1. DISCOVERY

Defendant first argues that he is entitled to an evidentiary hearing to determine whether trial counsel timely provided defendant with access to discovery materials to enable him to participate in his defense. In an affidavit accompanying defendant's motion for a new trial, which is not sworn or notarized, defendant averred that "on the date of October 10, 2019, my attorney stated for the record that he was in possession of the discovery and had failed to get it to me since the filing of demands for discovery on April 19, 2019." Defendant also stated that defense counsel "stated for the record on January 6, 2020 that I needed more time to look over discovery," because he had not received the discovery materials before that date. The record does not support defendant's allegations that he was not timely provided with the discovery materials.

With respect to defense counsel's alleged admission at an October 10, 2019 pretrial hearing that he had not provided discovery materials to defendant, the record discloses that defense counsel stated on the record on that date that he had "spent considerable time this afternoon, and I have been out to the jail on one occasion. We are getting the discovery all sorted out." Counsel also stated that he and defendant had met for close to half an hour before the pretrial hearing. Counsel noted that, to date, defendant had not received the complete discovery packet because of some sort of mailing error, and defendant stated that he had only received discovery for one docket. After discussing what materials should have been provided, defense counsel stated, "We agreed I would actually bring the whole packet out and make sure that it would get into your hands," and defendant agreed. Counsel asked defendant whether he was "satisfied with that," and defendant again agreed. Counsel also asked defendant, "And then without going into our trial and other strategies, we did discuss those matters in terms of motions that might exclude evidence and other types of matters to be brought forward, correct?" Defendant again agreed. Defendant also acknowledged that he wanted to proceed with the scheduled trial date. Defense counsel then stated that he would check with the prosecutor to ensure that all of the discovery had been provided.

Defendant's agreement that he was satisfied with the discovery he had been provided and was prepared to proceed with trial as scheduled arguably waived any claim that he had not been timely provided with discovery materials. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (waiver is the intentional relinquishment of a known right; one who waives his rights may not then seek appellate review of a claimed deprivation of those rights because the waiver has extinguished any error). In any event, the record refutes defendant's appellate claims that he had not spoken with counsel about discovery, or that failure to obtain discovery until October 10, 2019, prejudiced his ability to participate in his defense, particularly when trial was not scheduled to begin until January 2020.

The record also indicates that on the first day of trial, January 6, 2020, defense counsel informed the court that defendant was refusing to get dressed for trial because he had not had a chance to review all of the discovery materials and wanted to do so before jury selection. The court asked counsel how long defendant had possession of the materials and counsel stated that defendant had a previous attorney, whom counsel believed had provided defendant with the discovery materials and defendant had had possession of them for some time. Counsel added that

he believed he had also provided the materials to defendant. Counsel also stated that when he spoke with defendant, defendant was familiar with the case, and defendant told counsel the day before that he was ready to proceed with trial and understood things well enough. Counsel agreed that trial could proceed with jury selection and other preliminary matters. The prosecutor clarified that it was his understanding that defendant was arguing that he had not obtained discovery in the officer-involved shooting case. The prosecutor noted that defendant's first attorney would have been able to provide defendant with all of the discovery materials for both cases. The prosecutor further stated that, because of defendant's prior claims, the prosecutor had again sent discovery materials to defense counsel the week before trial. The trial court found that discovery had been timely provided, but stated that defendant could again review the materials before any witnesses were called—during breaks and in the evening. The prosecutor then stated that he was providing defendant personally with another copy of the discovery materials in the officer-involved shooting case.

To the extent that defendant did not waive his claim that he was not timely furnished with the discovery materials, given the statements on the record on January 6, 2020, the trial court did not clearly err when it found that the prosecution had timely provided defense counsel with the discovery materials and that counsel in turn had provided them to defendant. Moreover, although defendant asserts that he could have better assisted his counsel in preparing for trial if he had received the discovery materials earlier, "he does not explain what he actually would have done differently, either before or at trial, if he had received any discovery materials sooner." *People v Jackson*, 292 Mich App 583, 601; 808 NW2d 541 (2011). Therefore, defendant failed to show that he was prejudiced by any alleged deficiency on the behalf of trial counsel in this regard. *Id*. Accordingly, defendant has not demonstrated factual support for this ineffective-assistance claim, or shown that an evidentiary hearing is necessary with respect to this claim. See *Carbin*, 463 Mich at 600.

## 2. FAILURE TO CALL EXPERT WITNESSES

Defendant's argument with respect to the need for expert testimony appears to be two-fold. He appears to argue that trial counsel was ineffective for failing to request the appointment of expert witnesses to assist with a defense, and further, that the trial court erred by denying his posttrial request for appointment of expert witnesses to enable him to establish factual support at an evidentiary hearing that he was prejudiced by trial counsel's failure to request the appointment of experts. We conclude that defendant has failed to make the necessary preliminary showing that appointment of experts was necessary to assist with his defense at trial or to show that counsel's failure to pursue expert assistance resulted in a fundamentally unfair trial.

In *People v Kennedy*, 502 Mich 206, 210; 917 NW2d 355 (2018), our Supreme Court altered the standards that apply when an indigent defendant seeks financial assistance for the appointment of an expert. The Court adopted the standard set forth in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985), which requires that such requests be analyzed under the Fourteenth Amendment's due-process guarantee of fundamental fairness to determine whether a defendant has been provided with the basic tools necessary to present an adequate defense. *Kennedy*, 502 Mich at 214-225. Under this standard, a defendant is required to "show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id.* at

228 (quotation marks and citation omitted). The Court explained that it adopted the reasonable probability standard because, until an expert is consulted, a defendant may not know how expert assistance could aid his defense and, thus, it would likely be impossible to support his request without the assistance of an expert. *Id*. at 225-226. However, a defendant cannot make a bare assertion of the need for an expert, which would result in every defendant receiving funds for the hiring of an expert upon request. *Id*. at 226. The Court in *Kennedy*, 502 Mich at 226-228, adopted the test set forth in *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987), stating:

> A majority of states confronting this problem have adopted a reasonable probability standard. In *Moore v Kemp*, [809 F2d 702, 712 (CA 11, 1987)], the United States Court of Appeals for the Eleventh Circuit discussed this standard as follows:
>
>> [A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, such as insanity, he must demonstrate a substantial basis for the defense, as the defendant did in *Ake*. In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case.
>
> We believe that the standard articulated in *Moore* strikes the right balance between requiring too much or too little of a defendant seeking the appointment of

an expert under *Ake*. Therefore, we adopt *Moore*'s reasonable probability standard as the appropriate standard for courts to apply in determining whether an indigent criminal defendant is entitled to the appointment of an expert at government expense under *Ake*'s due process analysis. In particular, we hold that *a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.* [Quotation marks and citations omitted; alterations in original and emphasis added.]

Applying this analysis to the instant case, defendant has not demonstrated that it was objectively unreasonable for trial counsel not to seek expert assistance, nor has he shown that appointment of an expert is necessary to assist him in factually supporting an ineffective-assistance claim related to this issue.

At the posttrial hearing on defendant's motion for a new trial, the trial court asked appellate defense counsel whether the request for expert witnesses was because of a need "to have the expert look at it to determine whether it would have been potentially fruitful, from a Defense perspective, for counsel to have consulted with an expert," or whether the court needed to reach that issue because appellate counsel's argument was that trial counsel erred by failing to consult with experts to know whether one would have been beneficial from a defense perspective. Counsel explained that an expert was required to determine whether an expert could provide any benefit to defendant, and that the expert analysis would need to be completed before an evidentiary hearing was held. The trial court also noted that defendant had not articulated in sufficient detail why an expert was needed. It appears from counsel's statements on the record that counsel's arguments in support of the requests for expert assistance were predicated on positions advocated by defendant, but which either lacked factual support or were inconsistent with the available evidence. We conclude that the trial court did not abuse its discretion by rejecting defendant's ineffective-assistance claims with respect to this issue.

With respect to the alleged need for a video expert, an expert was not necessary to assist the jury in determining whether defendant was the person depicted in the video recordings. The jury was capable of making that determination itself. The only specific claim with respect to possible "tampering" of the video was the time stamp on the video, but this anomaly was attributable to the video's use of coordinated universal time. There was no other basis for questioning the authenticity of the video footage. And as the trial court also observed, the video evidence was corroborated by witness testimony. Thus, defendant failed to show a reasonable probability that a video expert was necessary to assist the defense or that denial of such expert assistance resulted in a fundamentally unfair trial. *Kennedy*, 502 Mich at 228.

Similarly, defendant failed to demonstrate a reasonable probability that a DNA expert could have assisted the defense. Although DNA was discovered on the Glock handgun that matched defendant's DNA profile, defendant's possession of that gun was depicted in the helicopter video evidence, several officers testified that they saw defendant firing the gun, and the gun was recovered from the same area where defendant was detained after having been shot. Thus, the evidence that defendant possessed the handgun was overwhelming, independent of the DNA evidence. Therefore, even if a defense expert could have cast doubt on the reliability of the DNA results, such testimony would have been of little value considering the body of additional evidence

-13-

linking defendant to the handgun. Moreover, given this additional evidence, defendant has not shown that the lack of a DNA expert resulted in a fundamentally unfair trial. *Id*.

With respect to a ballistics expert, the ballistics evidence further corroborated that recovered bullets were fired from the Glock handgun that was found near defendant, but such evidence was also used to tie defendant to the earlier apartment shooting. With respect to the former, given the large body of other evidence demonstrating that defendant possessed and used the Glock handgun during the officer-involved shooting, defendant has not demonstrated a reasonable probability that a ballistics expert was necessary to assist with the defense of that case, or that the lack of expert assistance resulted in a fundamentally unfair trial. Considering the large body of evidence identifying defendant as the person who fired the Glock handgun during the police confrontation, it was not unreasonable for defense counsel to instead pursue a defense that was focused on the issue of defendant's intent, and to argue that defendant did not act with an intent to kill when he fired his weapon.

It is a closer question whether a ballistics expert could have aided in the apartment shooting case. But regardless of whether there would have been a basis for requesting and obtaining expert assistance in that case, because the trial court granted a new trial with respect to the charges in that case, any analysis of that question is effectively moot. It cannot provide a basis for obtaining appellate relief from defendant's conviction in the instant case.

In sum, we agree with the trial court that defendant failed to demonstrate a reasonable probability that an expert could have provided assistance in the officer-involved shooting case, or that denial of expert assistance resulted in a fundamentally unfair trial. Accordingly, defendant has not shown that it was objectively unreasonable for defense counsel not to request expert assistance, or that appointment of an expert is necessary to enable defendant to establish factual support for this claim at an evidentiary hearing.

Affirmed.

/s/ Jane E. Markey
/s/ Jane M. Beckering
/s/ Mark T. Boonstra